897 P.2d 1356

**Ronald A. SOOS, Petitioner,**

v.

**SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF MARICOPA, the Honorable Pamela J. Franks, a judge thereof, Respondent Judge,**

**Pamela J. SOOS and Debra Ballas, Real Parties in Interest.**

**No. 1 CA–SA 94–0068.**

Court of Appeals of Arizona, Division 1, Department D.

Dec. 8, 1994.

Review Denied July 11, 1995.

Jones, Skelton & Hochuli by Eileen J. Dennis and Law Offices of John Zarzynski by John R. Zarzynski, Phoenix, for petitioner.

Robinson & Syme by Robert G. Robinson, Glendale, for real party in interest Soos.

Cawood & McKindles, P.C., by Harry E. Cawood, Mesa, for real party in interest Ballas.

## OPINION

CLABORNE, Presiding Judge.

This is a Petition for Special Action from the trial court's order declaring the surrogate parentage contracts statute unconstitutional and ordering an evidentiary hearing to determine which person would be the better "mother" for the triplets. Petitioner Ronald A. Soos ("the Father") contends that the trial court erred as a matter of law in holding the statute unconstitutional and that she exceeded her jurisdiction and legal authority. We disagree and find that the statute violates the Equal Protection Clause of the United States and Arizona Constitutions. We previously accepted jurisdiction and denied relief with an Opinion to follow. This is that Opinion.

## FACTS AND PROCEDURAL HISTORY

The Father and his then wife, Pamela J. Soos ("the Mother"), entered into a surrogate parentage contract with Debra Ballas ("the Surrogate")[1] because the Mother was unable to have children because of a partial hyster-

---

1. This case involves a surrogacy arrangement in which the surrogate mother gestates the babies

ectomy. Eggs were removed from the Mother and fertilized in vitro (in a test tube) by sperm obtained from the Father. Pursuant to a "Host Uterus Program" at the Arizona Institute of Reproductive Medicine, the fertilized eggs were implanted in the Surrogate. The Surrogate became pregnant with triplets.

During the pregnancy of the Surrogate, the Mother filed a petition for dissolution of marriage requesting shared custody of the unborn triplets. The Father responded to the petition, alleging that he was the biological father of the unborn triplets, and that pursuant to A.R.S. section 25–218 (1991), the Surrogate was the legal mother of the triplets. The Father further alleged that since the Surrogate was the legal mother of the triplets, the Mother had no standing to request custody.

In September of 1993, the Surrogate gave birth to triplets. The Father and the Surrogate filed a request for order of paternity with the Maricopa County Superior Court. An order was entered naming the Father as the natural father of the triplets, and the Father took custody of the triplets.

The Mother responded by filing a motion for appointment of counsel for the triplets, a motion for temporary emergency visitation, and a motion to consolidate the dissolution proceeding with the paternity action. In her motions, the Mother attacked the constitutionality of A.R.S. section 25–218(B) declaring the Surrogate to be the legal mother. The trial court in its minute entry said:

> THE COURT FINDS that there is not a compelling state interest that justifies terminating the substantive due process rights of the genetic mother in such a summary fashion.
>
> The current law could leave a child without any mother, as a gestational mother

("gestational surrogate") but does not share the babies' genes. Ova were extracted from the contracting mother and fertilized *in vitro* with the sperm of the contracting father. The resulting zygotes were then inserted in the uterus of the surrogate mother, who gestated the fetuses.

may have no desire to do more than she was hired to do, which is to carry and give birth to a child. The current law also ignores the important role that generations of genetics may play in the determination of who a child is and becomes. The current law does not consider what is in the best interest of each individual child.

> THE COURT FINDS A.R.S. § 25–218(B) to be unconstitutional.

An evidentiary hearing was set to determine which mother could better assume the social and legal responsibilities of motherhood. The trial court also ordered that the Mother have visitation rights with the triplets, and that the triplets would remain in the temporary custody of the Father. Following the denial of a motion for reconsideration, the Father filed this Petition for Special Action.

## SPECIAL ACTION JURISDICTION

As a threshold question, we address our special action jurisdiction. For two reasons, we have special action jurisdiction. First, the Father has no equally plain, speedy, or adequate remedy by appeal. *See* Ariz.Rev. Stat.Ann. ("A.R.S.") section 22–375(B) (1990); Arizona Rules of Procedure for Special Actions 1(a) (1988); *State ex rel. McDougall v. Riddel,* 169 Ariz. 117, 117, 817 P.2d 62, 62 (App.1991). Second, we accepted jurisdiction because the constitutionality of the surrogate statute is an issue of first impression and a matter of statewide importance. *See Duquette v. Superior Court,* 161 Ariz. 269, 271, 778 P.2d 634, 636 (App.1989); *Large v. Superior Court,* 148 Ariz. 229, 714 P.2d 399 (1986) (special action jurisdiction is appropriate over matters of constitutional significance).

## DISCUSSION

The Father raises three issues.

1. Did the trial court err as a matter of law in holding A.R.S. section 25–218(B) unconstitutional?

In cases involving simpler technology, the surrogate mother agrees to be inseminated with sperm from the contracting father in which case the surrogate is genetically related to the child born. For purposes of this case, we refer to the gestational surrogate simply as the Surrogate.

2. Did the trial court exceed her jurisdiction and legal authority, make an arbitrary and capricious decision, and abuse her discretion in ordering an evidentiary hearing to determine who would be the better mother?

3. If A.R.S. section 25–218 is constitutional, did the trial court exceed her jurisdiction and legal authority, make an arbitrary and capricious decision, and abuse her discretion in ordering visitation rights to the Mother?

The Mother responded to the Father's petition alleging that A.R.S. section 25–218(B) violated her due process, equal protection, and privacy rights guaranteed by the United States and Arizona Constitutions. The Surrogate also filed a response to the petition, joining the Father in his petition. We agree with the trial court and the Mother that A.R.S. section 25–218(B) is unconstitutional because it violates the Mother's equal protection rights.

A.R.S. section 25–218 provides in relevant part:

A. No person may enter into, induce, arrange, procure or otherwise assist in the formation of a surrogate parentage contract.

B. A surrogate is the legal mother of a child born as a result of a surrogate parentage contract and is entitled to custody of that child.

C. If the mother of a child born as a result of a surrogate contract is married, her husband is presumed to be the legal father of the child. *This presumption is rebuttable.*

(Emphasis added.) This statute was fashioned after the Michigan statute and enacted for the purpose of prohibiting surrogate parentage contracts. *See* minutes from *House Committee on Judiciary,* 39th Legis., 1st Sess. (H.B. 2360 April 4, 1989). The minutes of the House Committee on Human Resources & Aging meeting of February 16, 1989, and the minutes of the House Committee on Judiciary of April 4, 1989, reflect the governmental interests in prohibiting surrogate contracts. The statute was designed to stop "baby brokers" and to stop the trafficking of human beings.

The question before us is whether the State's reasons for enacting the surrogate parentage contracts statute are sufficient to withstand constitutional scrutiny under the due process, equal protection, and privacy rights guaranteed by the United States and Arizona Constitutions. We must keep in mind that we are dealing with a custody issue between the biological mother and biological father and the constitutional issues surrounding their competing interests. This is *not* a case of the surrogate mother versus the biological mother. We are *not* dealing with the constitutional questions that arise when the surrogate mother wishes to keep the child she bore. Thus, we limit ourselves to the question of whether the statute withstands constitutional scrutiny when it affords a biological father an opportunity to prove paternity and gain custody, but does not afford a biological mother the same opportunity.

## EQUAL PROTECTION

■ We first address the equal protection argument. The Mother argues that A.R.S. section 25–218 unconstitutionally denies her the right to equal protection of the laws. The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution denies "to states the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute." *Reed v. Reed,* 404 U.S. 71, 75–76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971).

■ In reviewing the statute, we must determine which of three standards applies. The first standard is a strict scrutiny test. It is applied to statutes that involve a suspect class or impinge on a fundamental right. *Bryant v. Continental Conveyor & Equip. Co., Inc.,* 156 Ariz. 193, 196, 751 P.2d 509, 512

(1988); *Church v. Rawson Drug & Sundry Co.*, 173 Ariz. 342, 349, 842 P.2d 1355, 1362 (App.1992). The second standard of review, the means-end scrutiny, has been limited to classifications involving gender and illegitimacy of birth. *Church* at 342, 842 P.2d at 1362. The final standard, the rational basis test, is used when the legislation does not involve a suspect classification or a fundamental right. *Id.* at 350, 842 P.2d at 1363.

■ We are dealing with a statute that affects one of the basic civil rights. The due process clauses of the state and federal constitutions, together with the rights emanating from the guarantees of the Bill of Rights, protect "individual decisions in matters of childbearing from unjustified intrusion by the State." *Carey v. Population Ser. Int'l*, 431 U.S. 678, 687, 97 S.Ct. 2010, 2017, 52 L.Ed.2d 675 (1977); *Stewart v. Maricopa County Superior Court*, 163 Ariz. 227, 787 P.2d 126 (1989); *Doe v. Attorney Gen.*, 194 Mich.App. 432, 487 N.W.2d 484, 486 (1992). "Marriage and procreation are fundamental to the very existence and survival of the race." *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942). A parent's right to the custody and control of one's child is a fundamental interest guaranteed by the United States and Arizona Constitutions. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972); *Cochise County Juvenile Action No. 5666–J*, 133 Ariz. 157, 161, 650 P.2d 459, 463 (1982). Therefore, although a gender-based distinction is at issue, the statute must be tested against a strict scrutiny analysis. That is, the government can only "justify the abridgment of such a fundamental right by demonstrating that a countervailing compelling state interest is thereby promoted and that the means are closely tailored to the end sought to be achieved." *Doe* 487 N.W.2d at 486, citing *Eisenstadt v. Baird*, 405 U.S. 438, 463–64, 92 S.Ct. 1029, 1043, 31 L.Ed.2d 349 (1972) (White, J., concurring); *see Bryant* 156 Ariz at 196, 751 P.2d at 512 (citation omitted) (the statute "may be upheld only if there is a 'compelling state interest' to be served and the regulation is 'necessary' to achieve the legislative objective.").

■ A.R.S. section 25–218(C) allows a man to rebut the presumption of legal paternity by proving "fatherhood" but does not provide the same opportunity for a woman.[2] A woman who may be genetically related to a child has no opportunity to prove her maternity and is thereby denied the opportunity to develop the parent-child relationship. She is afforded no procedural process by which to prove her maternity under the statute. The Mother has parental interests not less deserving of protection than those of the Father. "By providing dissimilar treatment for men and women who are thus similarly situated," the statute violates the Equal Protection Clause. *Reed*, 404 U.S. at 77, 92 S.Ct. at 254.

■ The Father responds to this problem by arguing that mere biology alone is not enough to create the parental rights guaranteed by our constitutions. We find this argument inapplicable. *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), holds that mere existence of a biological link is not enough to give rise to constitutional protections. Before a parent can claim a fundamental right, *a developed parent-child relationship must exist. Lehr* at 261, 103 S.Ct. at 2993; *see Pima Co. Juvenile Severance Action No. S–114487*, 179 Ariz. 86, 94, 876 P.2d 1121, 1129 (1994) ("While the State may not unduly interfere with an unwed father's ability to develop this relationship, it need not protect the mere biological link that exists if the father fails to step forward."). However, this rule cannot hold true in the surrogacy context. The biological mother can prove maternity only through her genetic or biological link. Further, since the surrogate statute does not recognize the biological mother as the "legal mother," she has no opportunity to develop a parent-child rela-

---

**2.** A.R.S. section 25–218(C) provides that "[i]f the mother of a child born as a result of a surrogate contract is married, her husband is presumed to be the legal father of the child. *This presumption is rebuttable.*"

tionship. She must rely on her biology to protect her fundamental liberties.

> The usual understanding of 'family' implies biological relationships, and most decisions treating the relation between parent and child have stressed this element. . . . The 'biological connection' is itself a relationship that creates a protected interest. Thus the 'nature' of the interest is the parent-child relationship; how well developed that relationship has become goes to its 'weight,' not its 'nature.' *Lehr* 463 U.S. at 272, 103 S.Ct. at 2999 (White, J. dissenting) (citation omitted).

■ By affording the Father a procedure for proving paternity, but not affording the Mother any means by which to prove maternity, the State has denied her equal protection of the laws. "A classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Reed* 404 U.S. at 76, 92 S.Ct. at 254. The surrogate statute violates this principle. We hold that the State has not shown any compelling interest to justify the dissimilar treatment of men and women similarly situated (the biological mother and father). The statute is unconstitutional on equal protection grounds.

## CONCLUSION

We find that the surrogate statute affects a fundamental liberty interest. The surrogate statute as it exists violates the equal protection guarantees of the United States and Arizona Constitutions.

Because of our resolution, we decline to address the remaining issues raised by the Father and the Mother.

Jurisdiction is accepted; relief· is denied.

McGREGOR, J., concurs.

GERBER, Judge, specially concurring.

In my view, the statute is unconstitutional for a number of reasons in addition to the one described above.

Preliminarily, the state, in principle, may indeed seek to regulate or even to prohibit surrogacy. It has a legitimate interest in preventing the mercenary trafficking in babies, i.e., rent-a-womb services and the buying and selling of eggs. It also has a legitimate concern to avoid the emotional disruption in the gestational mother likely to result from taking the child from her (e.g., Mary Beth Whitehead), as well as the child's denigration as an object of profit. These constitute compelling reasons in principle why regulation or prohibition in this area may be appropriate. *See* W. Wagner, "The Ethical and Legal Implications of Hired Maternity," 35 *American Journal of Jurisprudence* 187 (1990).

I agree with the majority that the present statute does not adequately achieve these goals, but for me the reasons differ. I agree with the trial court's reason for holding the statute unconstitutional, namely that it imposes the burden of motherhood on a surrogate mother who almost certainly does not wish it and did not contract for it. Her contract is to carry the child, not to nurture or raise it. The statute thrusts these burdens on her as a duty well beyond her contract.

By way of corollary to that reason, the statute disregards the best interests of the child. It does so in two ways. In the first place, by automatically giving custody of the child to the surrogate, the statute ignores the very real possibility, just mentioned, that the gestational mother has probably no interest whatsoever in raising the child, hardly a decision in the child's best interest. Equally importantly, the statute ignores the universal pattern in our domestic relations law to make the determination of the child's custodian an evidentiary matter turning on the child's best interests, rather than a matter of a *priori* statutory *fiat. See* for comparison, A.R.S. section 25–332, including subsection E, which prohibits any custodial preference based on gender.

Furthermore, the first part of the statute is overbroad because it prohibits all surroga-

cy whether it is mercenary or not. I cannot see any constitutional barrier to a properly-drafted statute which would permit surrogacy for limited altruistic motives other than profit, i.e., where a family member or friend agrees to serve as an unpaid gestational surrogate for the genetic mother.

Although I share the concern about the due process violation regarding the mother's inability to prove maternity, that issue seems to present no great practical problem because maternal identity always seems to be a given fact. To me, the reasons above are more compelling for holding A.R.S. section 25–218 unconstitutional.